UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

Kim Loftin,      )
          )
    Plaintiff,   )
          )  Case No. 4:07-cv-564
  VS.       )
          )
United Parcel Service, Inc. )
          )
    Defendant.   )

## Memorandum Opinion and Order

Defendant United Parcel Service, Inc. ("UPS") has moved for summary judgment on the Plaintiff's claims under the Americans with Disabilities Act, 42 U.S.C. § 12101, _et seq._ ("ADA"), the Family and Medical Leave Act, 29 U.S.C. § 2601, _et seq._ ("FMLA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621, _et seq._ ("ADEA"), and the Arkansas Civil Rights Act, ARK. CODE ANN. § 16-123-01, _et seq._ ("ACRA") (doc. #34). For reasons discussed below, the Court **GRANTS IN PART and DENIES IN PART** the Defendant's motion.

## I. FACTS

Plaintiff Kim Loftin ("Loftin") was hired by UPS in August 1986. In August 2001, he became a Business Manager for one of UPS's Arkansas package operations. Loftin performed well in the position, and in February 2006, UPS asked him if he would relocate to the Desert Mountain District to work in the Phoenix

1

Southwest Package Operation.  After accepting UPS's offer, Loftin and his wife relocated to Phoenix, Arizona in July 2006.  While the Loftins purchased a house in Phoenix, they decided they would leave their son with their adult daughter in Arkansas so that he could finish out his senior year in high school.

After the relocation was complete, Loftin was notified that his son had been caught drinking.  As a result, Loftin's wife returned to Arkansas to live with their son in early September 2006.  Thereafter, on September 10, 2006, Loftin requested a leave of absence for various personal health problems he attributed to stress.  UPS granted his leave request based on his medical restrictions, and Loftin returned to Arkansas to be with his family.

During his leave, Loftin contacted Desert Mountain Human Resources Manager Denise Ecker from Arkansas to inquire about a transfer from Arizona back to Arkansas.  Ecker informed Loftin that he did not fit the self-transfer guidelines under UPS's policy, but that he could submit a request under the policy nevertheless.  Loftin correspondingly requested a transfer via letter on September 28, 2006, based on his son's personal problems and his stress working in Arizona.  The letter was forwarded by Ecker to Region Human Resources Manager Lee Sardella, who determined that Loftin did not fit an eligibility category for transfer under UPS's policy.  Sardella did, however,

evaluate whether a special exception to the Self-Initiated
Transfer Policy would be applicable, which was prompted by
Sardella's communications with Loftin's former co-workers in
Arkansas, who valued him as a manager.  In his evaluation,
Sardella contacted Corporate Human Resources Coordinator Mike
Johnson to request a special exception.  In response, Johnson
told Sardella that the Corporate Workforce Committee would not
approve such a transfer request, nor would the Committee grant a
special exception to the policy for Loftin.

In the meantime, Loftin placed his Arizona home for sale on
October 29, 2006.  On November 11, 2006, Jon Robertson informed
Loftin that his transfer request had been denied because it did
not fit within the UPS policy categories.  Over the next few
weeks, Loftin met with Robertson in Arkansas to discuss his
employment situation.  Robertson told Loftin that he needed to
report to work in Arizona, but Loftin refused, claiming he was
unable to work from November 30, 2006 until early January 2007.
Ultimately, on December 4, 2006, Ecker sent Loftin a letter
stating that, effective December 1, 2006, his employment was
terminated based on his refusal to return to work in Arizona.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is proper when the evidence shows no
genuine issue of material fact and the moving party is entitled

to judgment as a matter of law.  <u>Phillips v. Mathews</u>, 547 F.3d 905, 909 (8th Cir. 2008).  The court views the facts in the light most favorable to the non-moving party, and it gives the non-moving party the benefit of all reasonable inferences.  <u>McNary v. Schreiber Foods, Inc.</u>, 535 F.3d 765, 768 (8th Cir. 2008).  The court "does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue."  <u>Tjernagel v. Gates Corp.</u>, 533 F.3d 666, 671 (8th Cir. 2008).  In employment cases, summary judgment should rarely be granted because the claims are inherently fact-based.  <u>Buboltz v. Residential Advantages, Inc.</u>, 523 F.3d 864, 871 (8th Cir. 2008).

## B.   Americans with Disabilities Act Claim

Loftin claims UPS terminated his employment based on his disability, failed to accommodate him based on his disability, and retaliated against him in regards to his request for an accommodation.  UPS contends that Loftin is not disabled within the meaning of the ADA, and even if he is, he never requested a reasonable accommodation.  Moreover, UPS claims, he would not entertain anything other than a transfer to Arkansas.

### 1.   Disability Discrimination Claim

Title I of the ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual."  42 U.S.C. § 12112(a); <u>McNary</u>, 535 F.3d at 768.  To establish a prima facie case of disability

4

discrimination, a plaintiff must show that he "(1) is disabled within the meaning of the ADA, (2) is qualified (with or without reasonable accommodation) to perform the essential functions of the job at issue, and (3) has suffered an adverse employment decision because of the disability." Cravens v. Blue Cross and Blue Shield of Kansas, 214 F.3d 1011, 1016 (8th Cir. 2000).

In this case, there is no dispute that Loftin was qualified to perform his job. To the contrary, most at UPS regarded him as a stellar employee with a history of success in the company. There is also no dispute that UPS terminated Loftin's employment. The parties dispute, however, whether Loftin was "disabled" under the ADA and whether that caused his termination.

Establishing a disability is a "significant hurdle" which requires an individual to show he has a physical or mental impairment that substantially limits one or more of his major life activities. 42 U.S.C. § 12102(2); Tjernagel, 533 F.3d at 671. To prove he is substantially limited in a major life activity, the individual must show that he is unable to perform, or is significantly restricted in performing, an activity that the average person can perform. 29 C.F.R. § 1630.2(j)(1); Ristrom v. Asbestos Workers Local 34 Joint Apprentice Committee, 370 F.3d 763, 769 (8th Cir. 2004). In determining whether the individual meets this standard, a court should consider the nature and severity of the impairment, the duration or expected

duration of the impairment, and the permanent or long-term impact, or the expected permanent or long-term impact resulting from the impairment.   29 C.F.R. § 1630.2(j)(2)(i)-(iii); <u>Toyota Motor Mfg., Kentucky Inc. v. Williams</u>, 534 U.S. 184, 196 (2002).

Loftin relies in large part on his doctor's assessment of his physical conditions (doc. #44, Exhibit #11).  Dr. Leslie's notes describe Loftin's vomiting, nausea, headaches, abdominal and chest pain, back pain, rectal bleeding, and epigastric discomfort.  In conjunction with these symptoms, the notes also depict Dr. Leslie's analysis of Loftin's ability to work.  While Dr. Leslie noted that "[a]t one point, there is no way this gentleman could have worked with the amount of duodentitis and ulceration in his stomach," he further concluded in the same note that "I think that he is able to work now" (doc. #44, Exhibit #11 at 32).  Further records support this conclusion, such as Dr. Leslie's letter on November 30, 2006, which states that, regarding the period of time from October 11th to November 1st, "He was disabled from that period of time until I released him to go back to work."  (doc. #44, Exhibit 11 at 37).  Dr. Leslie believed that Loftin's symptoms might be related to post-traumatic stress syndrome.  However, Dr. Leslie repeatedly indicated that "[w]hen [a neurologist and a psychiatrist] see him and release him I will be fine to release him" (doc. #44, Exhibit 11 at 38).

The Court certainly acknowledges the severity of Loftin's physical ailments and the resulting pain it caused him.  However, when considering the duration and long-term impact of the impairments, it is clear that they fall short of a "disability" within the meaning of the ADA.  See Williams, 534 U.S. at 195 ("Merely having an impairment does not make one disabled for purposes of the ADA").  Loftin's ability to perform basic tasks was not permanent or long-term.  29 C.F.R. § 1630.2(j)(2)(ii)-(iii); Williams, 534 U.S. at 198.  Rather, Dr. Leslie repeatedly indicated that Loftin would be cleared to return to work upon seeing a neurologist for his headaches.  While Loftin's impairments rendered him disabled for a period of time, they were not permanent or long-term in nature after that period, as explicitly noted by Dr. Leslie (doc. #44, Exhibit 11 at 37).

In support of his claim, Loftin cites to the Eighth Circuit's decision in Battle v. United Parcel Service, 438 F.3d 856, 861 (8th Cir. 2006) for the proposition that depression, anxiety, and obsessive compulsive disorders are ADA qualifying disabilities.  This case is distinguishable, however, because in Battle, the doctor testified that the plaintiff "would continue to suffer similar limitations in his ability to think and concentrate in the foreseeable future."  Id. at 862.  In this case, Loftin's impairments were not predicted to continue into the future.  Dr. Leslie noted that he was doing better and he

7

would be cleared to return to work.

Loftin's reliance on Duty v. Norton-Alcoa Proppants, 293 F.3d 481 (8th Cir. 2002) is similarly misplaced.  In Duty, the court found that a jury could reasonably conclude that symptoms of chilling, chronic neck pain, weakness, numbness, upper arm pain, and headaches indicated a permanent disability.  Duty, 293 F.3d at 491.  Here, on the other hand, Dr. Leslie's notes suggest that Loftin's symptoms diminished over time, at least to the point where he would be able to return to work.  While he may have been unable to work at one point, these symptoms did not indicate a permanent disability, unlike those in Duty.

Even if Loftin was not actually disabled, he may still qualify as being disabled under the ADA if UPS "regarded" him as being disabled.  42 U.S.C. § 12102(2)(C); Kosmicki v. Burlington Northern & Santa Fe R. Co., 545 F.3d 649, 651 (8th Cir. 2008).  "An employer regards the employee as disabled when it mistakenly believes that the employee's physical ailments substantially limit his ability to work."  Kozesek v. County of Seward, Nebraska, 539 F.3d 930, 935 (8th Cir. 2008) (citation omitted). This provision was meant to rebuke erroneous perceptions that disadvantaged the disabled, and thus, "if a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability."  Id.

Loftin claims that UPS's September 13, 2006 letter establishes that it regarded him as disabled because of its awareness of his "serious health condition."  The Court disagrees.  While UPS notes in the letter that the nature of Loftin's absence appeared to satisfy the definition of a "serious health condition," this definition was in relation to the FMLA. Loftin was granted leave under the FMLA based on his serious health condition, but this does not establish a disability under the ADA.  To the contrary, UPS appeared to disparage Loftin's disability claims, which was even noted in Dr. Leslie's November 30, 2006 letter (doc. #44, Exhibit 11 at 36-37).  UPS certainly did not mistakenly believe that Loftin was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes." Tjernagel, 533 F.3d at 672.  Rather, UPS's assertions that Loftin return to work in Arizona, combined with Dr. Leslie's notes, show that UPS did not regard Loftin as disabled.  Because Loftin was not disabled within the meaning of the ADA, nor did UPS regard him as disabled, the Court **GRANTS** UPS's Motion for Summary Judgment on Loftin's ADA discrimination claim.

### 2.    Failure to Accommodate Claim

Loftin also claims that UPS failed to accommodate his disability.  This claim is a separate form of prohibited discrimination under the ADA from the claim discussed above.

9

Buboltz, 523 F.3d at 870.  In this process, the employee must
first make a request for an accommodation.  Id.  If this is done,
the employer must then engage in an interactive process with the
employee to determine whether reasonable accommodations are
possible.  Id.  Finally, if an accommodation is determined to be
possible, then the employer must reasonably accommodate the
request, although it need not provide the exact accommodation
requested.  Id.

In order to prevail on his failure to accommodate claim,
Loftin must show (1) that UPS knew he was disabled; (2) that he
requested accommodations; (3) that UPS did not make a good faith
effort to assist him in making accommodations; and (4) that UPS
could have reasonably accommodated, but for its lack of good
faith.  Id.  Loftin focuses much of his argument on whether a
transfer to Arkansas would be a reasonable accommodation.
However, the Court need not analyze that issue because "[b]efore
an employer must make accommodation for the physical or mental
limitation of an employee, the employer must have knowledge that
such a limitation exists." Miller v. National Cas. Co., 61 F.3d
627, 629 (8th Cir. 1995).  In other words, "an employer is not
expected to accommodate disabilities of which it is unaware."
Id. (citing 29 C.F.R. app. § 1630.9 (1994)).  Generally, the
individual with the disability has the responsibility to inform
his employer of a needed accommodation.  Wallin v. Minn. Dept. of

10

<u>Corr.</u>, 153 F.3d 681, 689 (8th Cir. 1998).

According to Loftin, his September 28, 2006 letter informed UPS of his stress and his medical and health conditions of which UPS was already aware.  The Court disagrees.  Much of Loftin's letter was directed at his son's situation, which clearly would not alert UPS as to Loftin's personal disability.  Loftin's discussion of his "personal health problems" would not make UPS aware that he was disabled under the ADA.  Furthermore, to the extent Loftin's symptoms were previously known to UPS, "they were not so obviously manifestations of an underlying disability that it would be reasonable to infer that [his] employer actually knew of the disability."  <u>Miller</u>, 61 F.3d at 630.  While UPS considered Loftin to have a "serious health condition" for purposes of his FMLA leave, this is a distinct matter from a "disability" under the ADA.  Loftin did not have a "disability" under the ADA.  Based on Loftin's health status and the communications between the parties, UPS simply was not aware that Loftin had a disability requiring an accommodation.  The Court thus **GRANTS** UPS's Motion for Summary Judgment on Loftin's Failure to Accommodate claim.

### C.   Family and Medical Leave Act Claim

Next, UPS argues there is no issue of material fact regarding Loftin's FMLA claim.  According to UPS, Loftin received his entire twelve week leave under the Act, as well as

11

restoration to the job he had before he took his leave.  Loftin asserts that he did not receive his full leave, and that his rights under the FMLA were violated.

Under the FMLA, eligible employees are provided up to twelve workweeks of unpaid leave during any twelve month period.  29 U.S.C. § 2612; Darby v. Bratch, 287 F.3d 673, 679 (8th Cir. 2002).  After the employee returns, he must be restored to his previous position or another position "with equivalent employment benefits, pay, and other terms and conditions of employment."  29 U.S.C. § 2614(a)(1).  However, unlike the ADA, employers are not required under the FMLA to seek to reasonably accommodate employees who cannot perform the essential functions of their job.  Battle, 438 F.3d at 864-65.

Employers are prohibited from discriminating against employees who exercise their rights under the FMLA.  29 U.S.C. § 2615(a)(2); Darby, 287 F.3d at 679.  An employee may maintain two types of claims under the FMLA: (1) interference claims "in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA" and (2) retaliation claims "in which the employee alleges that the employer discriminated against him for exercising his FMLA rights."  Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006).

### 1.   Interference Claim

Under an interference claim, an employer may not interfere

12

with, restrain, or deny an employee's exercise of his FMLA rights.  Id.  "Interference includes not only refusing to authorize FMLA leave, but discouraging an employee from using such leave."  Id.  Thus, to succeed on an interference claim, the employee only need show that he was entitled to the benefit denied.  Id.  Similarly, because intent is immaterial under an interference claim, "Every discharge of an employee while he is taking FMLA leave interferes with an employee's FMLA rights." Id. at 1050-51.  This does not mean there is strict liability under the FMLA, however, because an employer will not be liable if it can prove it would have dismissed the employee regardless of his exercise of his FMLA rights.  Bacon v. Hennepin County Med. Ctr., _ F.3d _, 2008 WL 5273957, at *3 (8th Cir. 2008).

UPS asserts that Loftin received twelve weeks of leave prior to the separation of his employment.  According to UPS, the full leave period was satisfied during the period of September 11, 2006 to his termination on December 1, 2006.  Loftin, meanwhile, claims that UPS interfered with his rights under the FMLA and did not restore him to a position with the same rights and benefits that he should have been entitled to had he not taken leave.

While the Court agrees with UPS that Loftin was not entitled to a position in Arkansas upon his return from leave, other evidence in the record calls UPS's actions into question, thereby creating a genuine issue of material fact.  First, Loftin was

13

entitled to have his transfer request considered under UPS's policy, and it is questionable whether this was properly done, as will be explained in more detail below.  Second, UPS may have impeded upon Loftin's rights under the FMLA by accusing him of taking an "unauthorized leave of absence" in an October 27, 2006 letter from Denise Ecker, District Human Resources Manager (doc. #44, Exhibit #12).  In the letter, Ecker states that Loftin must produce documentation "justifying [his] continued absence," and if he does not do so, he will have voluntarily separated his employment with UPS.  Loftin's December 4, 2006 termination letter further refers to his allegedly questionable work release status on November 1, 2006 (doc. #44, Exhibit #16).

The Court believes there are questions of fact surrounding Loftin's work release status around November 1, 2006, and the resulting effect it had on his FMLA leave.  The dispute over the required documentation, which is referred to even by Dr. Leslie in his November 30, 2006 letter, places UPS's subsequent actions into question.  Furthermore, there is discrepancy regarding whether Loftin received his full twelve week leave under the FMLA.  If the period began on September 11, 2006, then his December 1, 2006 termination date would be at the end of that period of leave.  Viewing the evidence in Loftin's favor, particularly in conjunction with his attempts to secure a transfer to Arkansas occurring at the same time of this dispute,

14

there is a genuine issue of fact that he was terminated for a reason connected to his FMLA leave.  Duty, 293 F.3d at 494-95. Accordingly, UPS's Motion for Summary Judgment on Loftin's FMLA interference claim is **DENIED.**

### 2.   Retaliation Claim

Unlike an interference claim, under a retaliation claim, an employee must provide proof of retaliatory intent.  Stallings, 447 F.3d at 1051.  However, without direct evidence of retaliation, the claim is analyzed under the McDonnell Douglas burden-shifting framework.  Phillips, 547 F.3d at 912 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  To establish a prima facie case of retaliation under the FMLA, Loftin must show that he engaged in activity protected under the Act, he suffered an adverse employment action by UPS, and a causal connection existed between his action and the adverse employment action.  Darby, 287 F.3d at 679.  If Loftin is able to show this, the burden shifts to UPS to show a legitimate, nondiscriminatory reason for the adverse action.  Phillips, 547 F.3d at 912.  If UPS is able to do so, Loftin "must come forward with evidence that creates an issue of fact as to whether the asserted reason was pretext for discrimination."  Id.

UPS makes virtually no argument that Loftin cannot establish his prima facie case.  Even if an argument had been raised, it would not have been successful because Loftin clearly engaged in

15

protected activity by exercising his FMLA rights, and he was
subsequently denied transfer and terminated in circumstances that
gave rise to a causal connection.  See Darby, 287 F.3d at 680
(holding that the plaintiff presented sufficient evidence to
create an issue of material fact of whether defendants retaliated
against her for use of FMLA leave).  UPS's accusations against
Loftin while he was on leave, combined with the timing of the
transfer denial and termination, certainly provide enough
evidence for Loftin to get past his prima facie showing.

UPS's primary argument is that it terminated Loftin for a
legitimate, nondiscriminatory reason - he abandoned his job.  The
Court agrees that this is a legitimate, nondiscriminatory reason.
Thus, Loftin must demonstrate pretext in one of two ways: (1) he
may prove pretext indirectly by showing that UPS's explanation is
"unworthy of credence"; or (2) he may prove pretext directly by
showing that a prohibited reason "more likely motivated the
employer."  Stallings, 447 F.3d at 1052.

In this case, Loftin has a strong argument for showing the
former method of pretext based upon UPS's misapplication of its
own transfer policy.  UPS's "Family Transfer Request" policy
provides that it is "a formal process that allows [the employee]
the flexibility to move to another area to meet the needs of
[his] immediate family" (doc. #44, Exhibit #20).  Full-time
employees are allowed to request a transfer based, in part, on

"family medical or health issues."  Further explanation of these terms is provided in the "Family Transfer Request FAQs", which provides that "[t]ransfer requests may only be approved to attend to the medical needs of the employee or his or her spouse, domestic partner or child."

Loftin's September 28, 2006 letter requested a transfer to the Mid South district based upon his son's alcohol incident and his personal health problems.  Even if UPS is correct that his son's alcohol issue was an isolated incident that did not qualify as a "health issue", the policy still provides for transfers "to attend to the medical needs of the employee."  Clearly, Loftin was experiencing a myriad of personal health problems as a result of his demands at work and stress over his family situation, which Dr. Leslie can attest to.  Aside from meeting the transfer criteria on its face, Loftin's transfer request was also supported by his former co-workers in Arkansas.  For example, Jon Robertson's November 6, 2006 letter requests that Loftin be allowed to transfer to Arkansas, which "will be able to absorb [him] back into the district staffing plan at a FT Supervisor level, and quickly return to plan after several planned retirements occur in early 2007."  The letter goes on to describe Loftin's value to UPS and his "wealth of knowledge in Operations and I.E.," as well as the "key role" he will be able to play upon his return to Arkansas.

Despite the co-workers' support and his health circumstances, Loftin's transfer request was denied after he went on FMLA leave, and he was terminated immediately at the conclusion of his leave period.  Under these circumstances, Loftin has carried his burden of proving pretext by diminishing the credibility of UPS's proffered reason.  <u>Stallings</u>, 447 F.3d at 1052 (holding that an employee may prove pretext by showing that an employer deviated from its policies).  While the Court is mindful that it does not sit as a super-personnel department "reviewing the wisdom or fairness of the business judgments made by employers," the record in this case reveals issues of material fact that prevents the entry of summary judgment in favor of UPS.  <u>Id.</u>  Therefore, UPS's Motion for Summary Judgment on Loftin's FMLA retaliation claim is **DENIED**.

**D.   Age Discrimination in Employment Act Claim**

UPS also argues that Loftin is unable to establish his age discrimination claim under the ADEA.  Under the ADEA, an employer may not take adverse employment actions against an employee because of his age.  29 U.S.C. § 623(a)(1); <u>Fitzgerald v. Action, Inc.</u>, 521 F.3d 867, 876 (8th Cir. 2008).  The plaintiff may establish an age discrimination claim by direct evidence of discrimination, or by circumstantial evidence as exemplified through the burden-shifting analysis of <u>McDonnell</u> <u>Douglas</u>. <u>Fitzgerald</u>, 521 F.3d at 876.  Under the latter, the plaintiff

18

must first establish a prima facie case of age discrimination as follows: 1) he was over 40 at the time the employer took action against him; 2) he was otherwise qualified for the position; 3) the employer took an adverse employment action against him; and 4) the adverse action "occurred in circumstances giving rise to an inference of unlawful discrimination." 29 U.S.C. § 631(a); Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008); Loeb v. Best Buy Co., Inc., 537 F.3d 867, 872 (8th Cir. 2008). Once the plaintiff has established a prima facie case, the employer is required to show a legitimate, nondiscriminatory reason for the adverse action. Loeb, 537 F.3d at 872. Finally, if the employer proffers such a reason, the burden shifts back to the plaintiff to establish that this nondiscriminatory reason is pretextual and that age played a role in the adverse action. Id.

In this case, there is no dispute that Loftin meets the first two elements of his prima facie case. He is over forty years old and he was regarded by all as qualified for his position. UPS also took an adverse employment action against Loftin by denying his transfer request and terminating his employment. National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify . . . [and] each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice.")

19

But see LePique v. Hove, 217 F.3d 1012, 1014 (8th Cir. 2000)
(holding that a transfer involving only minor changes in working
conditions and no reduction in pay or benefits does not
constitute an adverse employment action).[1]

UPS disputes whether Loftin can meet the fourth element,
whether there is an inference of discrimination.  To do so,
Loftin may demonstrate discrimination "either through direct
evidence of discrimination, or through a disparate-treatment
showing that [he] was treated differently than similarly situated
employees."  Lowery v. Hazelwood School Dist., 244 F.3d 654, 657
(8th Cir. 2001).  In determining whether two employees are
similarly situated, all relevant factors must be analyzed,
depending on the context of the case, including issues such as
performance, qualifications, and conduct.  Radue v. Kimberly-
Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000).  However, "an
employee need not show complete identity in comparing himself to
the better treated employee, but he must show substantial
similarity."  Id. at 618.

In this case, Loftin identified two younger individuals,
Brian Beasley and Kenneth Scott, who received transfers under

---

[1]  UPS does not argue that Loftin's transfer denial was not
an adverse employment action.  Viewing the facts in the light
most favorable to Loftin, there are questions of material fact
that the transfer was not a "purely lateral transfer," but one
that may have provided an objectively more favorable position,
such that a denial could constitute an adverse employment action.

UPS's policy.  UPS argues these individuals are not similarly situated because their transfer requests fit within the express eligibility categories, whereas Loftin's request did not. Specifically, Beasley was granted a self-initiated transfer to be closer to his daughter for court-ordered visitation rights, and Scott was granted a self-initiated transfer to care for a parent.

The Court agrees that both child custody rights and care of a parent are express eligibility categories of UPS's policy. However, the same is true of Loftin's transfer request under the "family medical or health issues" category.  Loftin has provided more than mere speculation that an inference of discrimination exists because he has identified two younger individuals who were granted transfer requests based on the express eligibility categories, whereas his request that also fit within an express category was denied.  Bearden v. International Paper Co., 529 F.3d 828, 832 (8th Cir. 2008) ("[P]laintiff must offer more than speculation, conjecture, or fantasy in support of claims at summary judgment stage") (citation omitted).

At the next stage, UPS again asserts that its legitimate, nondiscriminatory reason for denying Loftin's transfer was that his request did not fit within the eligibility categories, and that he was fired for not returning to work.  The Court believes this reason is pretext, as discussed above, because UPS did not adhere to company policy with regard to its conduct in denying

Loftin's transfer request. Stallings, 447 F.3d at 1052; Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1123 (8th Cir. 2006) ("Viewed in a light most favorable to [the plaintiff], a reasonable jury could find [the employer's] adverse and selective application of the policy to be evidence that his reliance on the policy was merely pretext to hide a retaliatory motive").

Furthermore, Loftin's identification of Beasley and Scott suffices to permit a reasonable inference of discriminatory animus. See Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 643 (8th Cir. 2008) (holding that the plaintiff must do more than discredit an employer's asserted reasoning to show pretext). Loftin has met the rigorous test of showing that these individuals were similarly situated because each requested transfers under the self-initiated transfer policy, each had a request based under an express eligibility category, and each was treated more favorably by receiving a transfer. Compare Cherry v. Ritenour School Dist., 361 F.3d 474, 479 (8th Cir. 2004) (holding that the plaintiff failed to meet the rigorous test because she failed to identify any specific co-workers who were similarly situated but treated more favorably) and Bearden, 529 F.3d at 832-33 (holding that the plaintiff did not overcome the employer's legitimate, nondiscriminatory reason because there were no examples of other employees who were similarly situated) with Kehoe v. Anheuser-Busch, Inc., 96 F.3d 1095, 1103 (8th Cir.

1996) (holding that, in addition to discrediting the employer's reason for the failure to transfer, the employee's evidence, in part, that younger employees were treated more favorably would allow a jury reasonably to infer that age discrimination was the real reason for the adverse employment action).  Accordingly, because Loftin has demonstrated pretext by UPS's unexplained failure to follow its own transfer policy, as well as its more favorable treatment of younger employees, UPS's Motion for Summary Judgment on Loftin's ADEA claims is **DENIED.**

### E.    Arkansas State Law Claim

Finally, UPS asserts that Loftin's wrongful discharge claim under state law should be dismissed because Arkansas law does not apply, and because he was not discharged for any wrongful reason. Under Arkansas law, a wrongful discharge claim in violation of public policy sounds exclusively in contract.  Sterling Drug, Inc. v. Oxford, 743 S.W.2d 380, 385 (Ark. 1988).  The Arkansas Supreme Court has determined that when "resolving choice of law matters for contract disputes, the law of the state with the most significant relationship to the issue at hand should apply." Ducharme v. Ducharme, 872 S.W.2d 392, 394 (Ark. 1994).  To determine which state has the most significant relationship, the court must analyze the following factors: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter

of the contract; (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." <u>Crisler v. Unum Ins. Co. of Am.</u>, 233 S.W.3d 658, 660 (Ark. 2006).

The Court first notes that on a related matter, it has already issued an order denying UPS's Motion to Transfer to the District of Arizona based on similar reasons claimed by UPS here (doc. #11).  Turning to the choice of law principles, UPS asserts that Loftin's current job prior to termination was in Arizona, and he was terminated by the District Human Resources Manager responsible for Arizona employees.  Loftin counters that he had all of his employment conversations with Jon Robertson in Arkansas, and Robertson handled the termination of Loftin, with Sardella, in Arkansas.

The Court notes that the place of contracting and the place of negotiation, in terms of Loftin's original transfer agreement from Arkansas to Arizona, took place in Arkansas.  In addition, while Loftin worked in Arizona immediately prior to the events at issue, he returned to Arkansas upon his FMLA leave, where he carried out his communications with company officials.  Loftin's treatment from Dr. Leslie, which is the subject of much dispute in the case, was also received in Arkansas.

Furthermore, UPS carried out several actions in Arkansas in addition to extending its company representatives to Loftin.  For example, Keith Lorenzen, Workforce Planning Manager, completed a

"State of Arkansas Department of Workforce Services" discharge statement for UPS.  Company emails also indicate UPS's actions in Arkansas, such as Denise Ecker's November 2, 2006 email to Kerry Hasulak stating that Loftin "can get his DOT in Arkansas with a co. doctor" (doc. #44, Exhibit #13).  Considering these circumstances, as applied to the factors laid out by the Arkansas Supreme Court, the Court holds that Arkansas law controls in this matter because it was the place with the most significant relationship to the issues at hand.

Turning to the merits of the state law claim, the elements largely track the principles discussed above in Loftin's federal claims.  For example, a disability claim presented under the Arkansas Civil Rights Act is analyzed using the same principles employed in analyzing ADA claims.  <u>Duty</u>, 293 F.3d at 490. Accordingly, the Court's analysis conducted above is dispositive and need not be repeated here.  Loftin's state law claim based on disability discrimination fails because Loftin cannot prove he is "disabled".  Accordingly, UPS's Motion for Summary Judgment on Loftin's state law disability discrimination claim is **GRANTED**.

Similarly, Loftin is able to establish his state law discrimination claims based on age and his request for leave. There are questions of fact regarding UPS's violation of its own policy and its subsequent conduct, which is in violation of the State's public policy.  Under the circumstances, a reasonable

25

jury could find that the true reason for Loftin's transfer denial and termination was discriminatory animus.  Thus, UPS's Motion for Summary Judgment on Loftin's state law claims regarding age discrimination and FMLA-related discrimination is **DENIED**.

### III. CONCLUSION

Loftin is not "disabled" within the meaning of the ADA, and thus UPS's Motion for Summary Judgment on his ADA and related state law claims is **GRANTED**.  However, viewing the facts in the light most favorable to Loftin, there are genuine issues of material fact with regard to his claims involving the FMLA, ADEA, and related state law matters.  Accordingly, UPS's Motion for Summary Judgment on these remaining claims is **DENIED**.

**IT IS SO ORDERED**.

Dated this 5th day of January, 2009.


_____
RODNEY S. WEBB  District Judge
United States District Court